have your case under advisement. Our second case is number 21-13510, Ditech Financial, LLC v. AIG Specialty Insurance Company. I am going to let the lawyers get set up. Mr. Hoard, when you are ready, you have reserved three minutes for a rebuttal, but you may proceed. May it please the Court, my name is Steve Hoard. I represent Ditech Financial, the appellant in this case. Seated with me at counsel table is my partner, Flannery Nardone. We both appreciate being afforded the privilege of appearing before this Court. We're both licensed in Texas. Thank you, counsel. Can I start with jurisdiction? Yes, Your Honor. Thank you. Well, it'll be a theme throughout the day for me. So as I understand the procedural posture, the district court granted summary judgment on the breach of contract claim, but there is still pending and there has been no ruling on a counterclaim that's out there for reformation. Is that fact correct? That is absolutely correct. Okay. As I also understand, I just want to, yes or no, is this correct or not, there has been no Rule 54B certification. Correct. Okay. Normally, our normal rule is that where there are claims still pending and there's been no certification, we don't have jurisdiction. Why do we have jurisdiction here? We filed a joint response to the Court's jurisdictional question. I'd hope that was disposing of the issue, but I understand your concern. And I've read the response, and I know you both believe that it's moot. And that's all I really have to say about the issue. Okay. Well, I have a few things to say, a few questions. So mootness, the doctrine of mootness is that where a court can no longer grant relief. That's sort of the definition. I'm, you know, bumbling, paraphrasing the Supreme Court, but that's essentially what they've said, where relief can no longer be granted. As I understand it, in a reformation claim, a reformation is the contract is not reflective of the actual agreement of the parties, and we want to reform the contract, rewrite it to reflect the actual meeting of the minds of the parties. Why can that relief not be granted by the district court? That relief could have been granted by the district court, but it was unnecessary. If I can explain the context, Starr made a claim that a particular endorsement should be read in a particular way in their favor, but then argued in the alternative that if the court didn't agree with them, that it should be reformed. Well, in essence, the court did agree with them, so the request for reformation became unnecessary. Well, I get that they don't need that relief, but that's different than saying that relief is moot. In other words, let's take a different case. Let's say you, or I'm sorry, your opposing counsel brought five claims, one for breach of contract, one for unjust enrichment, one for, you know, three or four other remedies. They win on summary judgment on one, they get all the money that they're seeking, or just about all the money that they're seeking, and really don't care so much about two, three, four, and five, and you appeal. Would we have jurisdiction in that case? If the parties filed a pleading like we filed in this case, which basically said that issue is moot, and it's not necessary to reach that issue at all in order to resolve the appeal, then I think you would. And I think that's the position we took in the filing that was made jointly by the parties. I can just tell you that I'm having trouble with that position, because I think in the hypothetical I gave, if claims two, three, four, and five were still pending, despite the fact that you no longer really want to litigate them, because everything was sort of decided that you all cared about in count one, those claims are still there and absent certification, I don't know what basis we have to accept jurisdiction where claims are still out there. And that seems to be what we have here. As long as relief can be granted, in other words, the contract can be altered or formed, and that's separate and apart from the money damages that are sought on the breach of contract claim, whether you care about it now or not seems to be besides the point. But it's not separate and apart. It's again, this is an insurance coverage dispute. The defendants asserted 17 affirmative defenses, one of which that the claim was barred by this particular endorsement. We disagree with their construction of that endorsement. They had a counterclaim to reform it, and it became completely irrelevant. One of two things is going to happen in this case, if the court proceeds to issue a ruling. You're going to dismiss it and then come back. Well, they're going to dismiss it and come back. They could, certainly. Or it just goes back to the judge and it's still sitting there. If it was reversed, it would still be sitting there. I have no doubt that that will happen, but I think those sort of, to me, those sort of formalities are important. But I don't want to hold this up from the merits, and why don't you go ahead and make your merits argument. I'm going to ask similar questions to your opposing counsel. Thank you. Appellees concede, the insurers concede, and the district court found in its order at page four that the only alleged wrongful act at issue in this case is DITEC's failure to conduct the annual escrow analyses for borrowers in Chapter 13 bankruptcy. That is the only wrongful act for which DITEC seeks coverage under the policies. The U.S. trustee, when the U.S. trustee made a claim against DITEC for that wrongful act, failure to conduct annual escrow analyses, is the central issue in the appeal. It's DITEC's position that the four emails on which the insurers rely in support of their position that the claim was made prior to policy inception, as a matter of law, do not constitute a claim by the United States trustee for the wrongful act of failing to conduct annual escrow analyses, even when using the insurer's narrow construction of the definition of claim in the policy. Let's use yours. So as I read, I'm going to quote from page four of the gray brief, of your brief. Quote, the notice must convey an intent to hold the insured to account for the consequences of the wrongful act, and the remedy for those consequences must at least potentially be covered by the policy. Is that fair? Yes. Okay. So the October 8, 2015 communication. There, the trustees said that they had a problem with, quote, all of the mortgage servicing deficiencies, and that they wanted to discuss a potential national settlement. So do you agree with me that a settlement is at least potentially covered by the policy as a loss? I'm going to disagree with the basic premise. What the email actually says is that the U.S. trustee intends to move forward with discussions. Right. And express intent to hold the discussions about a national settlement. So answer my question. Is settlement a loss contemplated by the policy? No. Okay. So let's read from the loss provision. That's at docket entry 1-1 at 11 and 12. Loss is defined as, quote, the total amount, which I'll use DITAC instead of insured, became or becomes legally obligated to pay on account of each claim and for all claims in each policy period, dot, dot, dot, including but not limited to damages, judgments, settlements. True. But what kind of settlement? Well, okay. So let's get there. Let's get there. So then we have the next communication. So your two arguments are we don't know what the nature of the settlement is and we don't know what the deficiencies are. So the next communication is on March 30th of 2016. There they say, and they want to add to the agenda items, this is the trustees, we want to talk about the settlement and the deficiencies and we want to add two items. One, how does DITAC plan to deal with the escrow surplus or shortage caused by its failure to run the escrow analysis? The exact thing that you said is the issue here. And then second, that's at docket entry 65-1 and 502. And then did DITAC disclose, dot, dot, dot, the failure to run escrow analysis to its regulations? So to me, that sounds like the what is filled in about what the deficiency is. Do you agree there? I certainly agree that the failure to run escrow analyses was one of the deficiencies that was a topic of discussion. Okay. So and then the question is, well, what's the settlement? We don't really know. So then you have the April 11th, 26th communication where the trustee says, here are the four components of a potential settlement. A, robust statement of facts. B, consumer remediation. C, injunctive relief, which generally includes operational enhancements. And D, an independent monitor. Is at least some of those deal with something that DITAC is going to have to pay money for in order to meet one of those four things? Not related to the failure to conduct escrow analysis. An independent monitor wouldn't affect that very thing? The independent monitor for that particular issue was handled in-house by DITAC at no cost. I understand it was, but the question, remember, your definition is at least potentially covered by the policy. Is a monitor not potentially covered by the policy? You have to pay somebody to do it. If the U.S. trustee had made a demand upon us to go out and spend money to hire an independent monitor, arguably so, you don't think the four, first of all, it says independent monitor, but it says these are the four components of a potential settlement. Is that not potentially covered by the policy? If, again, if the U.S. trustee had followed that up and insisted on it with respect to escrow analysis. Again, it doesn't have to be that level of metaphysical certainty. We're not getting to judgment here. Even your definition, I'm just reading from the Gray Brief. You say, and the remedy for those consequences must at least potentially be covered by the policy. Certainly an independent monitor would potentially be covered by the policy, would it not? It potentially would be. What about operational enhancements, fixing the computers and making sure that this doesn't happen again? It was an all internal change in policy. I know, but that costs money. It didn't. Where's the evidence that it costs money? What about the consumer remediation? Consumer remediation, the U.S. trustee's lead representative, Kelly Callard, testified very unequivocally. I'm only talking about the face of these things. The notice just deals with the face of these things. So on the face of these things, how is consumer remediation not going to cost you something? Because it didn't cost us. I mean, as we proposed. Well, it ended up costing a lot. It ended up costing a lot. I agree with that. Then we get to the last email, the last communication, where they say the different ways to calculate the shortages and deficiencies. So there, at least, again, you're potentially on notice that it now is going to cost. It isn't just an internal fixing of the system or making it five years later. It might be something to your bank account, right? You said potentially on notice. I believe you're drawing inferences against... I'm only using your definition. The remedy for those consequences must at least potentially be covered by the policy. Well, my best answer, Your Honor, to that series of questions about the emails goes back to the testimony of Kelly Callard. Kelly Callard was shown each and every one of those four emails in her deposition. She was asked questions by Mr. Murphy, counsel for AIG, regarding each and one of those four. I want to back up. Is it an objective test in looking at what... In other words, the question is, what were you on notice of when was a claim first made? Do we look at testimony, or do we look at just the actual communications that would or would not have put you on notice such that you should have notified the insurance? I think it's an objective test, and you have to look at the written notice. I think I agree with that. So I went through the notices. Well, all I can tell you is when you look at the notices and you're drawing the conclusions that you're drawing from looking at them, I'm telling you that DITEC's representative, Christy Hancock, drew some other conclusion, and the U.S. trustee itself, the author of these communications, testified that no written demand, no written claim was submitted to DITEC. After she'd been shown these four emails, she said, no, we didn't put anything in writing. We did not demand that they waive the escrow shortages. We didn't put that in writing. She testified to that. You would acknowledge that we, as a court, can look at all of these emails together. Yes. We don't have to look at them in isolation. You do not, and I think you can put them in context. Absolutely, you can. I submit, Your Honor, that viewed objectively in reading them together, taking into account the circumstances surrounding them even, they do not constitute a sufficient written notice, an unmistakable specific demand for relief or demand for specific relief. And if we disagree with you, if we find that any of these pre-policy communications constituted a claim, would you agree that you lose on the other issues raised below? Well, we wouldn't have to even get to those other issues raised below. All right. And you've now exceeded your time, but you have saved some rebuttal? Yes. Thank you. Mr. Murphy? May it please the Court, Louis Murphy, struck, struck, shook, and struck. And LeVan, on behalf of AIG Specialty Insurance, I have at counsel table, table Joseph Lang, with Carlton Fields representing Starr and Dimnity. Thank you, counsel. If you could start with the jurisdictional question. Yes, Your Honor. I was listening to it carefully and thinking about it. Our position, Your Honor, is that the relief that was sought was the same. And that, therefore, if I. Counsel. I've read the wherefore clauses. I've read the declarations at the end of what we're seeking. A reformation, which is an equitable claim, that only seeks to reform the nature of the contract, is very different from the remedy that is being sought for a breach of contract. I disagree. Show me in the complaint where that's the case. My view is that what the relief that is sought is no coverage. That's what a termination of no coverage. The reformation is for no coverage. That's the consequence of the reformation, but that isn't the remedy that you're seeking for a reformation. Let me put it this way. You could have brought a deck action independent of this. You know what? We did an audit of our contracts, and we realized that we forgot to write DITEC into the line of this exclusion. We'd like to reform the contract so that something like this doesn't happen. That would have been litigated. You all would have won, and that would have been it, and that's completely separate from a breach of contract. Do you agree with me? I don't think I do, Your Honor, and for the record, I represent AIG specialty. I don't represent Starr and Dembe. I understand. So I'm doing my best to argue for somebody else. Well, I get it, but you have just as much a jurisdictional interest in this as anyone else. I do. I do, Your Honor, and when we discussed this among ourselves, Your Honor, when the counsel discussed it, what we did is we looked at the judgment itself, and the judgment itself is a very broad judgment, and it was a complete judgment. Therefore, we thought that the judgment itself that was entered was final, and it indeed was final with respect to the counterclaim as well. The problem is there are legions of cases where somebody stamps close the case, done statistically, this is over, where we in the Supreme Court have even found that it's not final. I remember when someone stamped that and had to come back and actually put initials on it in order for it to work, Your Honor, if I remember correctly. I see that in state court a lot. There was a stamp you literally would put on it, and you see the stamp a lot, but there would be some problem. Yes, Your Honor, I understand. The finality that was obtained in this regard, the argument is that there's an equitable change to the policy, but the equitable change to the policy wasn't for the purpose of having an equitable change to the policy. It was only as a secondary way to get to the final relief of no coverage, and since there is no coverage on this basis, then there's no reason to go forward with it, but I have to concede Starr has not dismissed the counterclaim as a result of it. I'll leave it here, and we'll get to the merits. I'm having trouble seeing the difference between that and if, for example, you had brought a breach of contract and unjust enrichment claim in the alternative if the contract had failed for some reason, and that was still pending, and all the district court had ruled on summary judgment and entered judgment on was count one. I think we would say in that circumstance that even though it's an alternative and even though you got all the relief that you really all wanted, that that still would be a pending claim and still would be a jurisdictional defect. I'm whipping through my mind the difference between, going back to law school in Florida, thinking about the difference between the equitable relief and for unjust enrichment, it seems to me that there is a different relief there that is requested in equitable relief than just mere breach of contract. Mere breach of contract is the damages, Axon v. Hadleydale. Then here with the equitable relief, you're seeking something else that's different. Here the relief comes together at the same point that there's no coverage. It seems to me that the relief's even, unjust enrichment, at the end of the day, you're seeking money. Yes. But here you're seeking something completely different, and that's just the change of the contract language versus money. But I'll leave it there, and I know you want to get to the merits. Yeah, and on the merits, Your Honor, we believe that the court opinion, which was very well written, it was closely, fact section closely cites all of the facts that were undisputed, that were admitted, went straight down the line and looked very carefully at, 13 pages, I believe, is something that should be affirmed because what the court did is it looked at, it determined that the October 8th, 2015 email message from Mr. Whelan on behalf of the U.S. trustee program was that he received a written notice, which was an announcement that the trustee program had decided to hold DITAC responsible in the form of a national settlement, a national settlement that would resolve all of the deficiencies. There's no real ambiguity with respect to the deficiencies that were at issue. Indeed, counsel for DITAC admitted in response to numerous questions by the court that indeed the failure to run the annual escrow analysis was included on those deficiencies. I have to say, counsel, I think your better argument is the one that Judge Branch asked about at the end, which is we read these things together and even if there is a deficiency or some hole in just the October 15th communication, which is the one that you're talking about, when you read the four together, they fill in whatever those holes about what mortgage deficiencies were and what the nature of this discussing of a settlement was. Certainly, Your Honor, and that's what we argued to the court. We argued to the court during the three-hour hearing that we had on the motion for summary judgment that taken together and in our post-argument memo, we say precisely these taken individually or together satisfy the notice requirement, Your Honor, and that's what we argued to the court and that's what the court found. Indeed, the court, although said that it did not need to go through the other remaining written communications that we referred to, the court did and said this reinforces the decision that the court has made that it was in fact proper for inner summary judgment on behalf of the insurance companies that the claim had first been made before the policy incepted. These claims were started in 2015. All of these communications, the attempt to settle the claim by DITEC in the form of a consent order all reinforced the conclusion that in fact that there had been a notice of the intent by the U.S. trustee program to hold DITEC responsible for its mortgage services deficiencies including the one that they are the only one they're seeking indemnification for and reinforce it and we absolutely agree with that, Your Honor, and that was a thrust of the opinion and therefore we think that it's appropriate to confirm on summary judgment the well-reasoned decision of the court. Can I ask you a question? Yes, Your Honor. You have presented two arguments. You say, you know, there was a claim in fact made there was not a claim, sorry, there was not a claim made during the policy period because it was made earlier. Yes, Your Honor. And then you have also raised the known loss doctrine and I'm just trying to figure out what the practical daylight is between these two things because it seems to me if we agree with you that the claim was made before the policy period you don't need the known loss doctrine. That is correct, Your Honor. And if we disagree with you and say the claim was made during the policy period I'm not sure what use the known loss doctrine. Well, Your Honor, the known loss doctrine is a doctrine based on public policy says that if you have a known loss you can't go and buy an insurance policy and then make a claim on it. Right, but don't they sort of coincide in a claims made situation? Well, indeed, this is actually an issue that the court raised below. We're discussing about the known loss doctrine but the known loss doctrine is simply based on the public policy that if you have a loss beforehand and in this case we point out all of the attorney's fees which they sought when they did their coverage letter and they sought in the first complaint that they filed $5 million of it which would have taken out AIG's policy that if you have that loss you cannot go out and buy an insurance policy to cover it and then make the claim. And it's not because it's unfair to the company or it's not a contract interpretation it's a public policy basis that says no this is not the way insurance should run because it affects all policyholders it affects the public with respect to the ability of the insurance system to function and if you have the branch that has gone through the roof you can't go out and buy homeowner's policy and then put a claim for the branch that went through the roof before you bought the policy. It has nothing really to do with the language of the policy it has to do with was there a loss beforehand. Counsel, what do we do with the summary judgment evidence that you're opposing counsel points to suggesting that reading these same communications this was not the intent or understood to be able to communicate that there was going to be some financial remediation or that it included this exact loss period. I mean, he points to the testimony I believe from both the representative from their company and what they understood it to mean and also a representative from the trustee's office about what they understood and what they were communicating. Well, the trustee testified very clearly I went through and asked the question who is supposed to be responsible for the robust statement of facts? Ditech. Who is supposed to be responsible for the consumer remediation? Ditech. There's no doubt about that. But the question is that was that a potential loss to them? In other words, they're saying as I understand their argument, they're saying well, we understood remediation just to mean to give them a couple years to be able to come back there and that's just a matter of tweaking something in our computer. This wasn't a $50 million or $40 million or $30 million payment to the trustees or the bankrupt parties. My view was that their understanding of it is to some extent irrelevant. What's relevant under the notice. Their understanding might be but what about the trustees understanding? Oh, the trustees understanding is clear in the record. There's their understanding that they intended to pursue consumer remediation. I would say, your honor, that consumer remediation You know, but it's the nature of that remediation that's the issue. And I don't think the nature of the remediation is something that's required for there to have satisfied the definition of a claim. There are other and this was a manuscripted policy where they negotiated the terms of the policy, your honor. And there are other policies where you say the consequences or you say the loss or you say the damages or there must be a demand for monetary and non-monetary relief. That's not here. It was written broadly. It's not narrow. It's written broadly in order to be able to pick up anything that is a claim so that you have a claim that can be pursued, your honor. And so it is written broadly. It's not just because it's broad doesn't mean it's ambiguous. It's written broadly to capture all of the kind of ways in which someone could be held responsible for these wrongful acts. I mean, your honor, if the consumer remediation had been to take something that DITEC was entitled to receive from the borrowers within a year and push it back five years, there's been consequences by that remediation being to form an injunctive relief. The court accepted their representation that that would have been no loss. Show me the language of the policy where that would cover that situation. Well, it would be, that situation would be injunctive relief. And, you know, so maybe there would not be a, when you went and sought indemnification from the insurance company, the request for injunctive relief, which frequently results in defense costs, and there would still be a legal obligation on the part of DITEC to pay its lawyers, at least, you know, that's my view on when my clients have a contract with me, that, you know, that, therefore, there would be a legal obligation to pay, and there would be, so the insuring clause makes sense. It pays for the defense costs in a claim that ends up injunctive relief. And frequently, certainly in an SEC investigation, when they're seeking... Show me the language that would include injunctive relief as something that you had to notify your insurer about in this policy. Well, if, in my view, it is the hold... I'm not talking about your view. I'm asking where in the policy. Show me. Um... My argument would be that in the definition of loss, it covers settlements, Your Honor, which would include injunctive relief in which there would be defense costs, which would be something that would be paid. What about the way we read things? There's a rule which says that where there are lists, we generally read those lists to have its sort of common denominator. So the lists include damages, judgments, settlements, and dot, dot, dot, a few other things in defense costs. That's at page 11 and 12 of the policy. I should have had the policy with me. I beg your pardon. It's okay. I have it here if you want. I've got a copy, Your Honor. Thank you. Thank you. I'm looking at docket entry 1-1, CMECF pages 11 and 12. And, and, and... Defining loss. And the definition of loss, Your Honor, what I'm trying to find real quick... That's the definition. It's on page 7 of the... Yes, Your Honor. The sheriff becomes obligated to pay account for any claims for wrongful acts with covered supplies, including unlimited... Damages, judgments, settlements, pre- and post-judgment interest costs, and defense costs. Yes, settlements. And defense costs are listed... It's with regard to settlements, or you have a judgment where you have a judgment for injunctive relief. There's nothing in there that says you can't have a judgment for injunctive relief. The question of whether it's indemnifiable by the company may be that whatever is ordered injunctively is not something that results in a monetary loss that should be paid. But my argument is that frequently it results in defense costs, which is a loss that the insurance company would pay. And I do a lot of, you know, security fraud litigation on behalf of D's and O's in insurance. And frequently, I mean, against the SEC, you're speaking injunctive relief. And the insurance that you're getting, that you're receiving, is the fact that the company or the individual would not be broke because the defense costs are paid. And, you know, that indemnification from the insurance company for that loss, which is in the form of defense costs. And, therefore, it would cover an injunction. Your Honor, that is our position. Thank you very much. Thank you. All right, you've got three minutes left, Mr. Hoard. Thank you, Your Honor. I want to discuss an analogy with the Court, if I may. Let's say I have an insurance policy that covers defamation claims. And I get an e-mail from someone that I have allegedly defamed that says, I believe you have committed a wrongful act in issuing some, publishing some statements that are defamatory. And I'm going to hold you responsible for that in the form of issuing a public apology and a retraction. Has that person made a claim against me under my policy? Has he just asked me to withdraw the statement? Am I going to call my insurance company up and say, hey, I got this e-mail? Can I use your hypothetical? Yes. What if it was, and I'd like for you to scrub it from anywhere that it exists? You're now getting into whether it's going to cost money? Or it's injunctive. Or it's injunctive. I would say this. Let's just say there's going to be some component of that sort included in the relief they're seeking. The policy itself, and this is one of the arguments I made in our brief, the policy itself says you don't have to report a claim at all until you reach a certain monetary threshold. The policy is clear on that. It's got to be, I can't remember if it's 50% of the deductible or 25% of the deductible, but there's a threshold. So it's not just the fact that there's going to be some monetary outlay. You'd have to quantify that. And until you have some quantification. I thought you conceded in your brief that it doesn't have to be monetary. In other words, that's not the requirement. There doesn't need to be a monetary demand. There has to be a demand, a demand for specific relief. This is my expanded reading. I don't want to use that word. But this is what I think is a reasonable reading of the hold responsible for means is that it's got to be holding you responsible in some manner that's going to give rise to coverage under the policy. Otherwise, why are you going to be talking to your insurance company about it? And if you're told that in that email, I want you to remediate me. That's a different story. It is a different story, right. And in fact, in my hypothetical, I was envisioning that. Because that word is pregnant with a lot of things. Yes. Right. That's what they were told here, right? No. Well, it was told. But Kelly Callard's deposition testimony. I'm not talking about the deposition. Well, you've got to understand what they mean by remediation. Counsel, you get your email. The email says, I want you to remediate me. You don't call your insurance company? They didn't ask us to remediate them. They asked us to remediate consumers. Issue. Right. And they specifically said what we proposed to basically give them 60 extra months in which to repay the escrow shortages was remediation. That's later. I'm talking about you get the email. The email says, here are the four points of a potential settlement. One of them is consumer remediation. Four components. For defamation. You don't call your insurance company? If they use that term in that context where it's obviously a damages, a tort-type damages situation, then I think you could conclude that. But not in the context of dealing with an escrow shortage issue. It doesn't imply to me. And I would like to finish. I know I'm over. But I think if you look at these four emails, just hold them in your hands, look at them, they don't meet the definition of a claim under the policy. Thank you. Thank you both. We have your case under advisement.